is U.S. v. Stephen Perez is the caption, and it's 24-162. Good morning. May it please the Court. My name is Kendra Hutchinson. I'm a Federal Defendant for the appellant in this matter, Lucha L. Your Honors, the statute at issue in this case regulates and imposes burdens on an individual's acquisition of firearms. This critical right to acquire firearms is core to the Second Amendment right to keep and bear arms. It is not the same as the right or the possibility of commercial sale, transfer, or dealing. This statute is not comparable, therefore, to colonial historical precedent prohibiting the sale of firearms to Native Americans or regulating the storage of gunpowder. Can I back up? Because before we start comparing to colonial whatevers, right, we have sort of a threshold question, which is whether that Bruin Step 2 framework applies here. And one of the things I'm struggling with is clearly statutes that on their face impact the right to keep and bear arms go to Bruin Step 2. I don't dispute that there are statutes that on their face don't do that, but regulate ancillary matters in a way that might burden the right to keep and bear arms. Do we have to do a threshold determination as to whether this is such a statute before we decide that Bruin Step 2 is the right place to go? Yes, Your Honor, we do. Bruin instructs us that we must evaluate whether or not the plain text of the Second Amendment covers the conduct here. And I would contend that it does. Well, I'm not sure if Judge Robinson was asking about this or not, but it seems to me there's a preliminary step before that, whether it's a regulation, a commercial sale regulation under Heller and Gazzola, which seems to maintain that sort of preliminary step post-Bruin. Sure, I think Your Honors are both really getting at the same question in many ways, is how do we characterize the conduct at issue here? And that's subject to a big dispute between me and my friend. We both characterize this in different ways, and Your Honor's getting at that. So yes, so number one, we must start with step one. And I just want to acknowledge that this court recently in Gazzola did, you know, on a public- I'm sorry, I'm sorry, I'm sorry. We're all stuck in the same spot. We don't think it's step- I don't think it's step one. It's preliminary to step one. Yeah, so I mean, my- maybe my question will help us move beyond this. Are you taking the position that we need to go through Bruin step two every time a law burdens firearm possession, no matter how remote, or do you agree that there are some things like either incidental burdens or there's commercial that get us out of Bruin step one and step two? There may be such cases, Your Honor, that do not involve the step one threshold, that do not in any way implicate the rights, the plain text of the Second Amendment. This is not one of them. The right to acquire has been recognized by this court in Gazzola. Every single court to analyze similar language from section 922N, all of the district courts, has- have held that that implicates the Second Amendment, that it burdens the Second Amendment right to acquire. And I must bring to the court's attention a case that I discovered during the course of my preparation. I did tell my friend about this, and I'm happy to file a letter afterwards. But in October 6th- October 8th of this year, the Sixth Circuit also interpreted the receipt and transport language of section 922N in United States versus Gore and held- in Gore and held that it did indeed burden the right to acquire. And that citation, for Your Honors, and I'm happy to file a letter after this, is 118- Really, that's only part of the question. The question is not just- it's like how- are you then taking the position that any vermin, no matter how slight, is- implicates- makes us go through Bruin step one and step two? No, I think Your Honors do have to decide whether or not the burden is indeed a burden on the Second Amendment right, whether it implicates the plain text. You don't have to decide that in this case, or you don't have to decide what that minimal threshold showing is, because there is ample authority for the proposition both from this court and every other court to address the issue that receiving and transporting implicates the right to acquire firearms. So yes, Your Honors are absolutely right that there may be a case- But doesn't DeCastro say that it's a minimal burden and not really something we need to be worried about? So that really gets to the second prong in many ways, Your Honor. I think that- So you think DeCastro speaks to second prong, not first prong? I do think that, Your Honor, yes. Because number one, that is how it's characterized in the Libertarian Party case of this court cited in our reply brief. This court characterized DeCastro's holding as going to, number one, the second prong of the means-end test, not the first prong, which was the threshold. Number one, DeCastro also did not hold that this was entirely unprotected conduct and indeed issued to decide whether or not wholly unprotected conduct would implicate the rights. But it did call it minimal, as Your Honor is bringing up. But a minimal burden is a burden nonetheless. It is our contention that the minimal or maximal nature of a burden is what is evaluated at the second step of Bruin. That is where you're trying to find a comparable burden in the historical record. So in your view, there's no difference between the framework we apply in analyzing something that burdens the right as described in the text of the Constitution versus something that may burden the right through its ancillary effect on the right described in the text of the Constitution. The fact that it's ancillary doesn't invite some prior threshold test as to the character of the burden or the significance of the burden to see whether it really throws you into the text and language of the Constitution. That's a fair question, Your Honor. No, I would contend that the right to acquire is well recognized enough by other courts, the ancillary right to acquire. It is not the right, you know, the core right to keep and bear, but it is an antecedent to keep and bear. One must acquire to keep and bear arms. And every court to look at this has decided that that must be analyzed under the Second Amendment framework. So what about sales tax? Sales tax. On guns? Yeah. Is that out of Bruin? Is that ancillary enough? Yeah, so I mean, I was thinking very hard in preparing for this. Like, what differentiates this from a licensing scheme? I was really talking to my colleagues and trying to really think about this and grapple with it. And I think you might be sort of getting at that, Your Honor. So the licensing scheme that was presumably or, you know, prospectively blessed in Bruin, a shall-issue licensing scheme which permits certain, you know, questions and requirements, and that this court also recently upheld in Antonia. You know, most aspects of it. A licensing scheme burdens two things. A seller or a dealer's ability to sell or deal. And I think that may go to the sales tax issue in some ways, Your Honor. And a purchaser or an individual's right to possess. Right to carry. And so Antonia in Bruin really got to the second right, right? The right to carry. The first aspect, this, the right of a, if there is a right, a seller or a dealer's ability to sell, commercially sell. Now, that may be something that does not make it to Bruin step two. And I think that, Your Honors, really the closest that you've approached this, and you really did begin to, was in the Gazzola case about a year ago.  I mean, and that, doesn't that bind our mode of analysis here? That's post-Bruin. It's pre-Antonia, but, and Rahimi, but I don't know that it impacts any, I don't see those cases impacting this portion of the methodological structure that Gazzola gives us. I think Gazzola's a fantastic case to really, to really frame what we're doing here. Because, you know, Gazzola was a derivative, derivative standing case. It was the sellers walking in and asserting the rights of individuals to acquire fireworks. And this Court acknowledged the difference between the two of them, and that derivative standing could be brought, in some cases, by the sellers, and analyzed, you know, their claims with respect to how they infringed upon an individual's right to acquire. So I think Gazzola- But it, but it, right. I mean, on the standing court, the whole, the whole reason the law could be challenged was because the regulation on the seller impacts the buyer, which to me means there's not this strong distinction between seller and buyer that I think that you rely on. But then under Gazzola, it's a commercial, you know, it's a commercial sale of arms regulation, which it then asked, only does the law affect, have the effect of eliminating the ability of law-abiding responsible citizens to acquire firearms? And then the answer that was no was the end of the inquiry. And so I, this goes to my, at least my preliminary question is, isn't that the first step? And is it a commercial sale of arms regulation? And if so, then we just ask the next question and resolve it. If it's not, then I think we go to Howler, sorry, to Bruin Step 1 and Bruin Step 2. Is that the wrong way to think about it? Uh, no. I mean, so whether or not, just to begin in the beginning, whether or not this burdens the right to acquire, I think is what Your Honor was asking. And I think you're saying that- I'm, maybe it's the same question, I'm not sure. I'm asking is, is it a regulate, is it a regulation on the commercial sale of firearms? No. The answer is no. The regulation on the commercial sale of firearms is found in 922 subsection B3. It's fine in subsection A1A, 922 A1A. It is found in 922 A2 and then D3. Those all deal with dealing, trafficking, selling. This- Why isn't A3 getting into the exact same thing from the other side of the transaction? There's nothing in A3 that says that any particular resident can't acquire firearms. It just says what sellers they can acquire them from and the method through which they need to be acquired. Isn't that really a regulation on sellers? No. And I would point, you know, I would point the court to, trying to think of analogies for this, to, for example, efforts to decriminalize drugs. Right? So there are statutory schemes in which it is lawful or at least not unlawful to possess drugs, but it is unlawful to sell them or to commercially deal in them or anything like that. And so, so there is a distinction. I mean, whether or not the court wants to bless this distinction is one thing. And I think that's what we're thinking about here. But there is a distinction, an analogical and, and analytical distinction between the two. And I think this really gets us to, you know, I'm not sure the court wants to go to the second prong, but I just want to note that the, the historical precedent that the, that the government brings up all concerns sale. It all concerns a person's disposition of a firearm, in this case to the undesirables of the time, Native Americans, and to, but, but none of, none of the regulations that the government brings up prohibit someone from acquiring. If, I mean, I, I sort of wondered as I was reading the record below, if the way that the whole historical analog conversation played out was overly influenced by perhaps some misunderstandings from Bruin as to the specificity of this analysis. And perhaps Rahini's asked us to take a step back and say, no, we're really looking at principles. And so if that's true, isn't it, what's really going on with this statute is that it's a backstop to state regulatory schemes, shell issue schemes, or schemes that would govern among other things, who and how firearms may be sold and by whom and how they may be  And if there's a historical antecedent for that concept, not any particular regulation within it, but for that concept, doesn't that essentially establish the historical predicate for a federal backstop to, to protect states against backdoor evasion of their own statutes? So, so if the court, in sort of coming from a bigger view, sort of a higher view, a bird's eye view here, the Rahini view versus potentially the Bruin view, you know, if the court goes that far back and decides that this is just, you know, sort of a cog in a larger commercial regulation and decides that there is historical antecedent for it, then, then, you know, the government has succeeded at their argument because that is what they're pressing before this court. But I would really ask the court to parse carefully the statutory scheme. There are, there are many subsections of the Gun Control Act and the Omnibus Crime and that regulate the sale in a way that protects the state's interests. And I'd like to come back to the state's interest in one more minute. But this is not one of them. This particular statute, this subsection, A3, only speaks to an individual's receipt or importation. And that is the conduct that is at issue here. And that's why this is an as-applied challenge. My client was not charged with selling. His co-defendant was. His co-defendant was charged with a different subsection of 922, with the dealing. But the statute doesn't say that your client can't receive or import. It just says, if your client is going to do that, here's the mechanism through which it happens, through a federally licensed dealer. That's right. That's right. And so, so the two questions are this, is does it, does it in some way affect or burden the right? Our argument is yes. The next question is, is what is the nature of that burden? And I think Your Honor is saying in some ways that it's minimal. You know, so it's sort of getting back to De Castro, even if that is not controlling law in terms of its analysis anymore. And I would just note that what this does say is that 49 out of 50 jurisdictions, guns cannot be, cannot be acquired. So only one out of 50 is, you know, jurisdictions guns can be acquired. And number two, there is an expense and a time delay involved in, for example, transferring a firearm from Hawaii to New York or New Jersey to New York or whatever, you know, whatever the case may be. I am not saying that this is an outright ban on possession. I can't credibly argue that. I can't argue. Nor is it an outright ban on acquisition, right? There's no individual New York resident who's otherwise qualified to acquire a firearm who's prevented from doing so by this statute. That's right, Your Honor. I am not making that argument. I could not credibly make that argument. But it is a burden nonetheless. And I would just point the court to the historical precedence here. And they do not support this burden at all. So even if, for example, the purpose of the forbidding of the transfer of firearms to Native Americans, even if we ignore the odious roots of that, but if we accept that as somehow akin to the purpose that's always sort of floating around these criminal statutes, disarming or preventing the acquisition of firearms by dangerous people. And I think that's what was sort of really floating around about this. Even if that is a comparable purpose to the purpose of the Gun Control Act that we're dealing with right now, it is not a comparable burden. So the burden here is a criminal penalty. Can we, looking at how and why, look to a different how than a different why, right? If we expand our view of what the analogs are, they might not be for the same reasons. But they share comparable minimal burdens. And we have some analogs as to comparable reasons, but with different burdens. Can we mix and match, I suppose? I mean, I think we have to. I think that Rahimi and Bruin both taught us that. And I think this court's recent- And Antonia. Antonia, yeah, absolutely. I mean, that was a very wide-ranging discussion of the state of colonial and civil war and Reconstruction law. So yes, we may mix and match remedies, penalties, regulations. I agree with that, Your Honor. But I think we have to note here that this is a criminal statute that imposes up to five years of imprisonment on a burden, burdening a right, the right to acquire, that does not do have been burdened at all by the historical precedent that is cited by the government. And so I just don't think that, even if you do accept that the purpose is the same, that the burden is the same in that instance. Now, as for the gunpowder storage, is that for the purpose of fire safety and ensuring- I guess, looking into this, it's also for the purpose of ensuring- You're calling it storage, but maybe I'm misunderstanding. I mean, looking at the colonial laws, no person shall transport any gunpowder out of this jurisdiction without license. Right? I'm sorry. I use that as a shorthand, Your Honor. So the gunpowder laws. But it's a prohibition on transportation out of state. That's right. And so it's either- so I would understand the fires as a fire safety and also as ensuring sufficient ammunition. We don't really know, do we? I understood the district court to say, and I'm not sure we've been presented here with real historical evidence as to the purpose. Okay. Fair? Assuming that those laws were to prevent the exportation of gunpowder, of ammunition, ammunition of the time. Again, this statute does not prohibit the exportation. 922b3, the corollary does. All the other ones do. And I just want to go very quickly. I'm very over my time at this point. But, you know, the state interests are weighty. I understand that. And we're not poo-pooing them lightly. And I understand the state interests that led to the findings, the congressional findings that led to the acts, the 1968 Act. The Bruin Court noted that Second Amendment law can be controversial. This may be, in this instance, Your Honor, just to strike or to hold unconstitutional this one subsection. Maybe that is controversial. But I just want to note that the states can adequately, there are plenty of tools available to the states to protect their interests. And here, Lucha L was charged with a state crime that would have carried seven years of imprisonment, not five. And it was dropped after the federal charges were brought. They had plenty of ability. And this was for unlicensed possession, not unlicensed acquisition from another state, but for not having a license under, you know, that was also unconstitutional. But thank you, Your Honor. Thank you. Thank you. Mr. Iskoroff. Do you know how to raise the lepter? It appears to be stuck. Oh, there we go. Thank you. Thinking that will benefit everybody. Thank you, Your Honor. May it please the Court, Lucas Iskoroff from the United States Attorney's Office for the Southern District of New York on behalf of the United States. Section 922A3 prohibits the transfer or receipt of out-of-state firearms other than through a licensed dealer. As this Court found in DeCastro, it does nothing to restrict the ability to obtain arms from within a state. And even out-of-state weapons may still be obtained through any of the several hundred federal firearms licensees in the state of New York. Accordingly, the statute imposes no practical burden on the right to armed self-defense. How would you have us distinguish between laws that, as I understand your argument, require a full-blown Bruin analysis and laws that ended Bruin step one? I think the key to this question is Judge Robinson's question about whether there's a difference between how we analyze a burden on the textual right itself to keep and to bear versus how we analyze a burden on the ancillary right. And I think that Gozola and Antonyuk answer this question. So Gozola does find that there is derivative standing and then goes to look at the purported burden on the ancillary right to sell, which is akin to the ancillary right to purchase. It finds that even if there may be some minimal decrease in convenience because some FFLs may go out of business, you might have to travel further to acquire a firearm, as the does not rise to the level of an actual impingement upon the core right to keep and bear arms. You look, on the other hand, at Antonyuk's discussion of sensitive places, for example. Bearing a firearm in a zoo may be, one would think, a fairly minor impingement on the right to bear arms, but it clearly is. You could bear arms in a zoo. Absent the law now, you cannot. So you do go to the historical analysis. And we had a fascinating discussion of the history of zoos in the 19th century. But I think that that's the difference here. Nobody would say that a law that said you cannot purchase a firearm in a zoo burdens the Second Amendment and requires a historical analysis because you could step outside the gates and purchase a firearm there. So that's, I think, the difference between looking at a burden on the textual right itself, which, once it is established, necessitates the step to historical inquiry, versus looking at a burden on the ancillary right. There, what we're looking at is whether that burden on the ancillary right actually has a practical impact on the ability of citizens to possess and use guns for lawful self-defense. There's no such burden here as this Court found in DiCastro. So there is a dispute in DiCastro. Is it binding? Is it not? Was it applying the means and scrutiny that was abrogated by Bruin? I think that's really irrelevant to the question because the basis for the whole thing in DiCastro is that there was no practical burden on the right to armed self-defense. That begins and ends the inquiry under Heller, under Bruin, under any standard. It has a footnote which seems to say it's not addressing the question of whether it fits within the textual meaning of the First Amendment. It disclaims that step is unnecessary, but it doesn't go on to actually apply the means and scrutiny. So it states its conclusion as saying— Meaning, but it seems to kind of front-end means and scrutiny, doesn't it? It does set up the discussion— It just seems totally different from what we, I think, now are meant to do under Bruin. In terms of whether we're bound by the methodology, I suppose the proposition is that it's inconsistent with the methodology of Bruin. We're not bound by it. We, therefore, start over with the analysis under Bruin. That may be the case, that it was operating, and it did set out that it was operating under this means and scrutiny and framed its analysis in terms of determining whether heightened scrutiny applied. But what I'm saying is that's really— Whether it's binding, whether it's holding is binding or its methodology is binding is irrelevant because what it found was that the burden—was that 922A3 imposes no practical burden on the right to keep and bear arms. So now that we're in this Bruin analysis and we're starting out by whether the text of the Second Amendment is implicated, it's not, for exactly the same reason that the actual right to keep and bear arms— But what in Bruin allows an analysis of burden at step one textual analysis? Well, the text is not implicated. So the text is the right to keep and bear arms. And if we're talking about a direct burden upon the right to keep and to bear arms, then I would agree that once we've established a burden, perhaps even a de minimis burden or any burden whatsoever, I don't think we need to reach that question in this case. But potentially, once we've established any burden at all, we've launched into step two and we're looking at colonial history and historical analogs. But when you're not talking about to keep and to bear textually, you're in the world of Gozola. So Gozola is looking at the right to sell, which is a necessary antecedent to the right to keep and to bear. If the right to sell were extinguished entirely or were made so prohibitively difficult that it was practically, you know, impossible or substantially more difficult to bear arms, that would implicate the right. But Gozola does not apply any historical analysis. Gozola does not look at 18th century or 19th century regulations on firearms dealers. It doesn't look to anything. What it says is that there's no practical impact on the right to keep and bear arms. That ends the inquiry there. And as I understand it then, Gozola talks about commerce, but the concept that you're describing, which is that an ancillary, a potential ancillary burden as opposed to a burden on the direct textual right, whether it's commercial or some other sort of ancillary burden, is in the box that calls for that threshold determination of whether it actually burdens the right that's described specifically in the text. Is that right? I think that's right, Your Honor. Again, it's not entirely clear from either Heller or Bruin whether the court's discussion of long-standing qualifications and conditions on the commercial sale of arms is meant to describe a category of regulations that fall outside of the inquiry or that are consistent with long-standing historical practice and thus blessed within the historical inquiry. I'm not 100% sure. I think this court could get there either way. But I think Gozola clearly points that out to that the cleanest and the most faithful way to the textual analysis, to the text and history analysis set out by Bruin, is to first look at this step of whether the rights protect, the core of the right protected by the Second Amendment, the actual text of it, to keep and to bear arms is implicated. And the answer here is that it's not. So you would situate what I will call the Gozola question within step one rather than as a precursor to step one? Yes. There was a sort of a question, are there three steps or two steps? That's clear. That was my question. Yes. I don't think it's, this may be how many angels can dance on the head of a pin here. I have always viewed it as that there are two inquiries. One is, is the text implicated? And then two, does the history justify? Um, so I think you could situate it within that first question. Um, but, uh, you know, I. Right. I mean, I think it would go that there's this sort of carve out presumption first recognized in Heller and carried through to Bruin, which, which asked whether, you know, which said, well, we're not, of course, we're not calling into question, you know, lots of things that are commercial regulation of commercial sale. Uh, and then Gazzola tells what, what, what to do, what the test is if we're in that box. I thought of it as a preliminary step. If the answer is, well, no, because it's a buyer. So it's not a commercial sale regulation. Then I think then an argument would be you're in step one and then step two. So I think, again, it's not entirely. I think the way Gazzola sets out is that we are, once we're talking about a commercial restriction on the commercial sale of arms, then we have a presumption of constitutionality. Right. And then I think the cleanest way to analyze it is within that first step, is that presumptive, is that presumption overcome by some showing that there is in fact such a burden on the sale or the commercial transaction firearms that we now are practically impinging upon the right to keep and bear arms such that we must go to the second step. So for, you know, if you had a. Or the first. Or the first step. Yes. Depending on how. I do, I do understand. And I, I'm not sure, you know, this is like the now, uh, you know, irrelevant discussion of whether there was a Chevron step zero or, uh, you know, um, but I, I think that, I think that it, however you want to look at it here, what you're looking for is something like, so, you know, the Supreme Court in Bruin footnote nine approves of these shall issue licensing regimes, which are frankly far more burdensome than 922A3 is here. It is, you know, fingerprint analysis, background check. You may have to submit references. There's a lengthy application form, none of which any court that I'm aware of has ever suggested in and of itself raises second amendment scrutiny and requires the historical analysis. Now, if you were in some world where there were a $10,000 application fee or a 12 month waiting period, then you might be in a world in which now there's a sufficiently serious burden on that step of acquisition that there's a practical limitation of the right to keep and bear arms. So this kind of goes to the question. Now we're going to shift to the shall issue framework. So let's assume that we understand the Supreme Court to have blessed the concept of a shall issue framework. Does that take it outside of, do we just not even get into step one, step two, because the court has burdened it or is the court saying we, because clearly those do burden or could burden the right at step one, but yet there's enough historical acceptance of these or basis for it that we don't have to go through it every time because we've blessed it. Right. So I think Antonyuk is helpful here because Antonyuk does bless most features of the licensing regime. And the distinction there is between, I think the answer is the Supreme Court and implicitly Antonyuk have blessed the existence of a shall issue licensing scheme, they'll not. Right. So if simply the fact that a licensing scheme exists, fine, no constitutional scrutiny there. That's a sort of incidental administrative burden on the right to acquire, which is only an ancillary right to the right to keep and bear. The substantive features of the licensing regime, the disclosure of social media accounts, the, you know, how extensive, you know, if there were a requirement that you had to own property in order to, you know, to get a license, you know, whatever the substantive features are, those might be, those might then substantively implicate the right to keep and bear. But I think this looks much more like the existence of a licensing scheme, they'll not. You know, the Fifth Circuit said in Mansfield's session, you know, so one, this court noted in DeCastro, there's 1700, there's hundreds of FFLs in the state of New York. It's convenient. It's presumably the most convenient place to buy anything. There's no practical impact there. Even if you're looking at the case where I really want that specific gun that my brother has in California or is, you know, for some reason, particularly available at this dealership in South Carolina, the Fifth Circuit noted in Mansfield's session that the requirement to transfer through an in-state FFL is a very minimal, is really not worthy of constitutional scrutiny at all either. That this is, it's a slight delay. It's a slight matter of paperwork. That's much like the licensing scheme. So I, I see that I've gone over my time and if the panel has no further questions. Um, well, do you want to, I'm curious to hear your view on the historical analogs. So if, if we do end up in that step, um, your response to your colleagues' arguments as to the, the, the, the lack of analogy, um, uh, on the identified laws. Sure. And I think this picks up on the, the panel's discussion with my colleague about kind of the sale versus, whether the sale versus purchase distinction is a relevant one. We, we talked about it in the context of step one, but now if we're in the historical analysis, I think here instructive is Antoniette's discussion of Rahimi, where they note that what Rahimi dealt with was a criminal prohibition on possession triggered by a civil protective order. Both of which were fairly novel legal innovations as the, as the Antonio Court described them. But the principle was to restrict the possession of firearms by dangerous people. So, and, and this gets to Judge Robinson's point, to the panel's point that what Rahimi says is that we're looking for principles. We're not looking for historical twins. We're not focused, we're not looking at, well, was it import versus export? Was it storage versus this? What we see from the historical record is a broad principle that states were, and the federal government were entitled to control the interstate triggered firearms. Now, the fact that historical circumstances were different may have led them to focus on export because they were facing external, they were more concerned about external threats, of invasion or, or things of that nature. But as the Antonio Court noted, we have to be mindful of changing societal conditions. And we have to be mindful that the fact that the, that a legislature historically did not regulate a certain type of conduct may speak to different circumstances and a lack of political demand rather than a lack of authority. I, I'm interested in the focus on interstate trade because I understand facially that's what this looks like. Um, if we ran the thought experiment of putting the exact same provision into the New York statute, here's our regulatory framework. And by the way, you can't go acquire a firearm from out of state and evade our framework. Is that an interstate regulation of the, of the, um, transport of firearms? Or is that just a part of maintaining the exclusivity of New York's regulations? I think it's both, Your Honor. To the extent they, to the extent it was part of a package, which it in some ways is in 922 AF, you must go through the lawful channels that we've prescribed. That fits in with the regulations that we've described on the licensed sale and storage of gunpowder. That fits in with longstanding regulations, um, the, the licensing regime, the shall-ish licensing regimes that arose post-Civil War and immediately, shortly after the enactment of the 14th Amendment that the Supreme Court discussed in Bruin. So that would, if we were looking at a state law that was focused on within state conduct, it might, it, you might be looking at a slightly different set of laws, but it would, there would still be a robust historical tradition of laws that control the trade in firearms and ensure that it's challenged through legitimate means. I guess I'm just trying to figure out whether situating in a federal statute is a federal backstop to state regulatory regimes versus a state putting it in its own statute. Um, leads us to a whole different set of comparators or whether going back to our conversation about the presumptive constitutionality of state regulatory regimes, whether this is just a corollary of that rather than some distinct thing involving interstate transport. That's what I'm trying to figure out. I think that's also a perfectly legitimate way to look at it is that, is that there is a broad historical principle that states can determine how firearms are sold and to whom they're sold and states can set up regimes to ensure that their mandates in that area are rendered effective. And this is one example of the federal government in this instance, setting up a mandate to ensure that both state and federal regimes are rendered effective. So I think that, again, again, I think that dovetails with Antoniuk's caution per Rahimi not to elevate form over substance. So I think if you're looking at the substance, which is that it is, you know, you can look at one broad principle is state and federal control of the firearms trade. Another broad principle is state and federal, is state's ability to control who gets a firearm and how they get it. And which is one that 922A3 renders effective. So I think both broad principles support the law in this case. And I would urge the panel to affirm. All right. I want to ask Mr. Isaacroff just before you sit down, I'll ask Ms. Hutchinson as well. To the extent you're aware of the many cases that we have in circuit in the queue, are there any that you would identify as implicating overlapping issues for which we should hold? I don't think there are any that this panel needs to hold for. There are certainly cases, there are cases in the queue that implicates that I'm aware of 922G1, which is felon, which is felon's ability to possess firearms. I think there may also be a 922G9 case, which is about domestic violence misdemeanor convictions. It is always possible that those decisions may further elaborate and elucidate the principles derived from Bruin, Rahimi, Antonyuk, et cetera. But I think this does, because we're talking about this commercial qualifications and restrictions on the commercial sale of arms kind of category of cases, I'm not aware of any that this court is currently holding that implicate that discussion directly. Thank you. I'll be very brief because we've kept the court here for a long time. I'll agree with my colleague that I'm not sure that there are any cases that would hold this case up and they might be interesting. And I know that Judge Pettis, you have one of them, the misdemeanor crime of domestic violence case. But would it matter for the answer to your question whether we were focused on step one or step two? In other words, if we were going through the historical analog analysis, would that change the answer to your question versus a decision that turned on this threshold question? It's a great question, Your Honor. As far as I know, the felon and possession cases that are pending before the court, some of them do involve step one because there's questions about whether the individuals are the people. And I don't know that that's really an issue in this case. So I don't think that that would elucidate anything as to that. In terms of the historical precedent, you know, I'm going to say no, Your Honor, because I think that the historical precedent site in this case is really radically, it's sort of like in a whole other Venn diagram of historical precedent. And in fact, this is a novel issue that no other court has decided at this level. The district courts have looked at this case. But no circuit courts have addressed the statute. So we're looking to this court for guidance. And there's two that perhaps you're not aware of. The Guillain-Balvo, is that ringing any bells? Versus Suffolk County. So it must be a 2254, perhaps. Anyway, that's a challenge to New York concealed carry improvement act, including a licensing requirement for good moral character. Is that recently decided, Your Honor? Not decided. Oh, not decided. Guillain-Balvo, 23-208. Thank you. And the only other one I saw, Corbett v. Hochul, 22-3210, which is the concealed carry, New York's concealed carry law, which has a fire safety training requirement. Okay. Not on your radar. Not in as much as they involve licensing, Your Honor. I think also Judge Rakoff decided another case about a week ago. The injunctive phase concerning New York City's administrative regulations as well. But that's not before this court. As we're talking about some of these New York challenges, though, our challenge to the New York laws, I want to pose to you the same question I posed to your colleague. If this were a New York statute that said essentially the same thing, would our analysis be any different, either as to whether we get to Bruin Step 2 or how it would apply? Well, I think there might be, you know, if this case were litigated below, there might be different challenges before this court. There might be some dormant common commerce clause challenges or privileges and immunities challenges, quite frankly. There's other stuff sort of afloat when the federal government comes in to, you know, to sort of take care of the interstate aspect of this. So I think this would be a different case, Your Honor. And I'm not aware of any state cases that actually criminalize or prohibit possession of firearms from another state. As I understand it, they all prohibit unlicensed possession. So that's different, right? That's compliance with a licensing scheme that I think Bruin is going to bless in one form or another, you know, some sort of licensing scheme, versus prohibiting an origin, you know, a gun's origin, acquisition of a gun from, you know. Well, it's not really an origin, right? Because you can get it from that origin. It's requiring acquisition through the state's process.  Okay. I'm not aware of a criminal penalty. I can look into this, too. We bombarded you with questions before you got into rebuttal. So if you need a short... Yeah, I'll go very quickly. There is a very good reason to consider this a step one question, like whether or not this conduct, you know, what we're talking about here, the statute, whether or not it should be discussed at step one or step two. And that is because it is a simple test, as set forth by Bruin, is whether or not the plain text of the conduct is covered by the Second Amendment. This is focused on conduct. It is not focused on, like, sort of a judgment or an evaluation, as we've been doing this entire argument, as to the effect of this burden or not. This is a very simple focus on conduct. It is an easy-to-administer test, too. And litigants and courts can locate all of this evaluation and discussion in step two, in the burden, and whether or not the burden is justified. And so I think there's a reason to do it prudentially. Although step two doesn't really... It's not whether the burden is justified, right? That was means end. Step two is whether there's a historical analog. Well, I think in some aspects, it's been the language has been comparably justified, whether the comparable burden that's comparably justified. So yes, you're right. It's not the same thing as a means end. So that's one reason to keep this at step one, to locate this statute there. But I just also want to end on this note, which is finding subsection A3 unconstitutional does not invalidate any licensing schemes. Not New York's, not any other states. It does not invalidate the whole section 922 licensing scheme, or the Omnibus Crime and Control Act. It does not call any of that into question. Because again, this argument is focused solely on the individual's right to acquire, not this regulation of sale. And I also want to note that this does not undermine state interests in regulating who possesses firearms. They are able to do that through lawful, shall issue licensing schemes. Thank you. Thank you. Appreciate it. Well argued on both sides. We will take it under advisement.